UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

DAVID J. O'CONNOR,

                           Plaintiff,                          **REPORT &**
                                                                 **RECOMMENDATION**
                                                  CV 16-4395 (ADS) (GRB)

          -against-

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                           Defendant.

-----------------------------------------------------------------X

**GARY R. BROWN, United States Magistrate Judge:**

      Plaintiff David J. O'Connor ("plaintiff") commenced this civil action pursuant to the

Social Security Act, 42 U.S.C. § 405(g) seeking judicial review of a final decision of defendant

Nancy A. Berryhill (the "Commissioner" or "defendant"), the acting commissioner of the Social

Security Administration ("SSA") at the time of filing, which denied his application for disability

insurance benefits.  Presently before the undersigned, upon the referral of the Honorable Arthur

D. Spatt for Report and Recommendation, are the parties' cross-motions for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set

forth below, the undersigned respectfully recommends that the district court deny plaintiff's

motion for judgment on the pleadings, deny the Commissioner's cross-motion for judgment on

the pleadings, and remand the case to the ALJ for further proceedings.

# BACKGROUND

1. **Procedural History**

   ## A. Administrative History

   Plaintiff filed a Title II application for Social Security Disability Benefits on November 5, 2012, alleging disability due to herniated discs, spinal tilt, sciatic nerve damage, sciatica, degenerative disc disease, foot numbness, and significant disc space narrowing as of December 22, 2011.  Tr. at 134-40, 168.[1]  Plaintiff's application for benefits was denied on May 20, 2013, and plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  *Id*. at 85-98.  ALJ Gal Lahat conducted a hearing on June 9, 2014 during which plaintiff was represented by counsel.  *Id*. at 37-73.  Plaintiff as well as a vocational expert testified at the hearing.  *Id*.

   On March 6, 2015, the ALJ issued a decision (the "ALJ Decision") finding that plaintiff was not disabled, as defined in the Social Security Act, and therefore was not entitled to disability insurance benefits.  *Id*. at 13-31.  On June 13, 2016, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  *Id*. at 1-6.

   ## B. The Instant Case

   Plaintiff commenced this lawsuit on August 7, 2016.  DE 1.  On June 21, 2017, plaintiff moved for judgment on the pleadings.  DE 19.  The Commissioner submitted a cross-motion for judgment on the pleadings on the same day.  DE 21.  On March 1, 2018, the district court

---

[1] References to "Tr." are the Transcript of the Administrative Record filed in this case.

referred the cross-motions for judgment on the pleadings to the undersigned for report and recommendation.  DE 27.

## II.    Factual Background

### A.  Non-Medical Evidence

Plaintiff was born on June 26, 1963, and he completed high school in 1981.  Tr. at 44-45, 134.  Plaintiff worked as a construction carpenter until December 22, 2012, when he injured himself lifting sheetrock at a construction site.  *Id*. at 45, 159-66.  He has a significant earnings record and was insured for benefits through December 2016.  *Id*. at 141-55, 157.

Plaintiff completed a Function Report on March 8, 2013, in which he reported daily pain in his back and buttocks.  *Id*. at 177-87.  He stated that he lived with his family in a house, and had no problems with independently bathing, grooming, dressing, or cooking.  *Id*. at 179.  He performed light cleaning, dusting and laundry, made his bed, ran errands, drove his car, but needed help with vacuuming, shoveling snow and performing lawn care.  *Id*. at 180.  Twice a week he would grocery shop, a few times during the season he would fish but needed a chair to rest, he attended church, went to the park, and visited friends.  *Id*. at 180-87.  Plaintiff reported that he had to move around and could not stand for a long period of time, estimated that he could walk one mile but had to sit and rest after a few hours of walking, and could not lift heavy objects.  *Id*. at 182-84.  He reported that since his surgery on September 18, 2012, his pain level had decreased, and he takes Oxycodone or Cyclobenzaprine, as needed, to help manage the pain.  *Id*. at 186-87.  Plaintiff indicated that his doctor gave him a back brace to wear when he travels or goes out, and explained that driving long distances and sitting for long periods are painful and

that the pain disrupted his sleep.  *Id*. at 183-84, 187.

Represented by counsel, plaintiff testified at the administrative hearing before ALJ Lahat on June 9, 2014.  *Id*. at 37-73.  He testified that he last worked as a carpenter on December 22, 2011, when he injured his back while lifting 110 pound sheetrock at a construction site.  *Id*. at 45-46.  By January 1, 2012, plaintiff was unable to move, stopped working, and supported himself with his banked medical benefits.[2]  *Id*. at 46.  He reported pain down the left side of his body that was exacerbated by sitting, walking and movement.  *Id*. at 48.  Plaintiff testified that he initially sought chiropractic and physical therapy treatment, and that prior to his surgery in September 2012 his doctor administered four epidural injections and prescribed a muscle relaxant.  *Id*. at 45, 48, 49, 69.

Following back surgery on September 12, 2012, plaintiff reported that he continued to experience pain in his left buttocks and leg, and on a "bad day" he experienced pain on his right side.  *Id*. at 48.  Plaintiff testified that although the surgery decreased the pain in his leg, there had been no change in his back pain.  *Id*. at 50.  Following surgery his doctor recommended light stretching exercises and pain medication only if needed since he should "use the pain as an indicator" to stop activities that could reinjure his back.  *Id*. at 50-51.  Plaintiff reported he currently takes Oxycodone only as needed, but that post-surgery, he took Oxycodone for approximately one month, and then switched to Aleve two to three times per week.  *Id*. at 51-52.

---

[2] By July 2013, he started receiving a disability pension from the construction workers' union. *Id*. at 46.

His doctor recommended that plaintiff continue walking until he felt pain, but he was only able to walk a quarter of a mile (or 10 to 15 minutes) before he developed pain in his leg.  *Id*. at 52.

Plaintiff testified that he was able to drive 10 to 15 minutes at a time, shower while holding a grab bar, use public transportation, do light laundry, go shopping with this wife, dry dishes, and take small bags of garbage to the front of the house.  *Id*. at 53-55.  Since he stopped working, plaintiff made a couple of trips to Lake George, sitting as a passenger and stopping every two or three hours to stretch and walk.  *Id*. at 60.  Plaintiff reported that he could comfortably lift and carry up to 10 pounds, walk a little more than a quarter of a mile on a good day, stand for 45 minutes at a time, and sit for an hour and a half to two hours at a time.  *Id*. at 54-57.  During the winter, however, he was stiffer.  *Id*. at 57.  Plaintiff stated he had no difficulties climbing stairs or balancing or using his hands, but reported he needed to bend his knee when crouching and avoided bending at the waist.  *Id*. at 57-58.

### B.  Medical Evidence/Treating Sources

#### 1.  Medical Evidence Prior to Plaintiff's Back Surgery

##### a.  Radiology

An MRI study of plaintiff's lumbar spine dated January 21, 2011 indicated a moderate to large disc herniation at the L4-L5 disc level, a moderate size broad-based posterior disc herniaon at the L5-S1 level with significant degenerative disc disease, and mild congenital spinal canal stenosis of the lower lumbar spine, exacerbated by the L4-L5 herniation.  *Id*. at 215-16.

An MRI study of plaintiff's lumbar spine dated August 15, 2012 showed a left paracentral disc herniation at L4-L5 with severe canal stenosis, additional severe canal stenosis

at L3-L4 and some stenosis at L5-S1. *Id.* at 285. In addition, lumbar spine x-rays performed on plaintiff on August 15, 2012 revealed degenerative disc disease of the upper lumbar spine without translational instability. *Id.* at 282.

An MRI study of plaintiff's thoracic spine dated September 11, 2012 showed multilevel thoracic degenerative disc disease. *Id.* at 279-81.

### b. Donald C. Keith, D.C.

On March 4, 2012, plaintiff's chiropractor Dr. Keith completed a treating source statement for New York State Office of Temporary and Disability Assistance, reporting that he had treated plaintiff from January 3, 2012 to January 28, 2012 for lumbar disc herniation. *Id.* at 208-14. He noted that plaintiff reported lower back pain that radiated down his leg to his ankle, especially if he walked or stood too long. *Id.* at 208. Plaintiff initially responded to chiropractic treatment, but had relapsed and went for epidural injections. *Id.* at 209. Dr. Keith noted marked decreases in lumber spine range of motion with pain, positive straight leg raising tests, tenderness upon palpation, and abnormal gait with severe antalgia. *Id.* at 210-11. He opined that plaintiff could lift and carry up to ten pounds, stand and/or walk for less than two hours a day, sit for less than six hours a day, and concluded that plaintiff was unable to work as of the last visit on January 28, 2012. *Id.* at 211-12.

### c. Stephen G. Geiger, M.D.

Dr. Geiger, a physical medicine and rehabilitation specialist administered epidural steroid injections on March 12, 2012, April 9, 2012 and April 23, 2012. *Id.* at 322-29, 343-45. On May 8, 2012, Dr. Geiger performed an electromyography (EMG) and nerve conduction study on

plaintiff which revealed evidence of acute lumbar radiculopathy, involving primarily the left L5 and S1 nerve roots. *Id*. at 340-42. He referred plaintiff to physical therapy. *Id*. at 217.

### d.  Peak Performance Physical Therapy

Plaintiff attended physical therapy from May 9, 2012 through June 27, 2012, when he was discharged due to expired insurance authorization. *Id*. at 217-75. On June 5, 2012, he reported some temporary relief with aquatic physical therapy, was able to sit but experienced pain with walking and standing. *Id*. at 231, 262. Plaintiff reported improvement in walking at his June 8-14, 2012 sessions, and indicated that he could not stand for longer than one hour or walk more than one-half mile without increased pain. *Id*. at 220, 225-29. The discharge report to Dr. Geiger noted that plaintiff continued to have radicular pain when walking, but that he benefitted from aquatic physical therapy. *Id*. at 217.

### e.  James C. Farmer, M.D.

Dr. Farmer, an orthopedic surgeon, examined plaintiff on July 18, 2012. *Id*. at 296-98. He reported that plaintiff walked with a normal gait and appeared to be in no acute distress. *Id*. at 296. Dr. Farmer found plaintiff had full motor strength (5/5), intact sensation, full ranges of motion in bilateral lower extremities, but increased left leg symptoms with extension. *Id*. at 297. He diagnosed left lower extremity neurogenic claudication secondary to disc herniation at the L4-L5 and L5-LS levels and recommended a new lumbar MRI and extension x-rays. *Id*. at 297-98.

Plaintiff returned to Dr. Farmer on August 15, 2012 and stated that he was continuing to have pain down his left leg and back. *Id*. at 295. Although comfortable sitting, plaintiff

complained that he was limited in his ability to walk and stand. *Id.* Dr. Farmer reviewed an

MRI and lumber spine x-rays dated August 15, 2012, noted that plaintiff was "significantly

limited by his symptoms, and assessed lumbar spinal canal stenosis with neurogenic

claudication. *Id.* at 282, 286, 295. He recommended surgery in the form of a lumbar

decompression at L3-4, L4-5 and at L5-S1 as well as a discectomy at L4-5. *Id.* at 295.

At a pre-operative appointment on September 11, 2012, Dr. Farmer reviewed a pre-op

thoracic spine MRI which showed multisegmental thoracic disc degeneration, noted lower

extremity symptoms with neurogenic claudication, and recommended a lumbar decompression

and discectomy. *Id.* at 294, 279-81.

On September 17, 2012, Dr. Farmer performed a posterior lumbar decompression at L3-

L4, L4-L5, and a posterior lumbar discectomy at L4-L5. *Id.* at 286-89.

### 2. Medical Evidence / Treating Physicians Post Surgery

### a. James C. Farmer, M.D.

At his first post-operative visit on September 26, 2012, Dr. Farmer noted that plaintiff was

doing exceedingly well overall, had no pain and was pleased with his result. *Id.* at 293. Dr.

Farmer found full strength (5/5) in his lower extremities bilaterally, sensory was intact, and

recommended physical therapy and continued participation in activities as tolerated. *Id.*

Plaintiff was to return in four weeks unless he experienced problems or concerns. *Id.* In a

Pension Disability Affidavit dated September 29, 2012, Dr. Farmer reported that he had treated

plaintiff from July 18, 2012 to September 26, 2012, that plaintiff had leg pain involving the

buttock, groin, lateral calf and a limited ability to walk and stand, that x-rays showed a large

central canal disc herniation at L4-L5, L-5 nerve compression and L5-S1 disc protrusion, that plaintiff was ambulatory, and that his diagnosis was status post lumbar decompression and lumbar discectomy. *Id*. at 290. Dr. Farmer opined that plaintiff was recovering from spine surgery, would start physical therapy, was "disabled from performing carpentry work in heavy construction," and would be able to resume working in approximately three months. *Id*.

Plaintiff returned for a follow up visit on October 25, 2012, and Dr. Farmer reported that he experienced occasional back pain, but overall was "very functional," and was "doing well." *Id*. at 292. An examination indicated full strength (5/5) in his lower extremities bilaterally, sensory was intact, and some tenderness over his right posterosuperior iliac spine. *Id*. Dr. Farmer recommended plaintiff continue with the exercises learned in physical therapy and continue with activities as tolerated. *Id*. Plaintiff was to return in six weeks unless he experienced problems or concerns. *Id*. On December 5, 2012, Dr. Farmer noted that plaintiff was doing "exceedingly well," with no significant pain. *Id*. at 291. An examination indicated full strength (5/5) in his lower extremities bilaterally, sensory was intact, and no lumbar tenderness to palpation. *Id*. Dr. Farmer concluded that plaintiff was "doing very well," and he recommended that plaintiff continue with home exercises and begin to increase his aerobic activities. *Id*. Plaintiff was to return in three months unless he experienced problems or concerns. *Id.*

In an updated Pension Disability Affidavit dated February 7, 2013, Dr. Farmer reported that he had treated plaintiff from July 18, 2012 to December 5, 2012; plaintiff had leg pain involving the buttocks, groin, lateral calf and a limited ability to walk and stand; x-rays showed a

9

large central canal disc herniation at L4-L5, L-5, nerve compression, L5-S1 disc protrusion; plaintiff was ambulatory; and his diagnosis was status post lumbar decompression and lumbar discectomy. *Id.* at 305. Dr. Farmer opined that plaintiff was still recovering from spine surgery, was still in physical therapy, was "disabled from performing carpentry work in heavy construction," and his ability to resume work was "indefinite." *Id.*

On March 28, 2013, plaintiff returned to Dr. Farmer's office for a follow up appointment and reported that overall he was "doing well," his back ached if he was too active, and has limited ability to perform any type of "heavy activities." *Id.* at 319. An examination indicated full strength (5/5) in his lower extremities bilaterally and sensory was intact. *Id.* Dr. Farmer concluded that plaintiff was overall doing "reasonably well," and he recommended that plaintiff continue with activities as tolerated and lose weight. *Id.* Dr. Farmer's impression was status post lumbar decompression. *Id.* He noted that plaintiff would not be able to perform his previously heavy work duties, and directed him to return in six months unless he experienced problems or concerns. *Id.*

In an updated Pension Disability Affidavit dated January 10, 2014, Dr. Farmer reported that he had treated plaintiff from July 18, 2012 to October 22, 2013; plaintiff had leg pain involving the buttocks, groin, lateral calf and a limited ability to walk and stand; x-rays showed a large central canal disc herniation at L4-L5, L-5, nerve compression, and L5-S1 disc protrusion; plaintiff was ambulatory; and his diagnosis was status post lumbar decompression and lumbar discectomy. *Id.* at 320. Dr. Farmer opined that plaintiff was still recovering from spine surgery,

was still in physical therapy, was "disabled from performing carpentry work in heavy construction," and his ability to resume work remained "indefinite." *Id.*

### b. Stephen G. Geiger, M.D.

Dr. Geiger completed a Pension Disability Affidavit on February 21, 2013 and reported that he had treated plaintiff on a weekly basis from March 8, 2012 to May 8, 2012 for lower back and left leg pain. *Id.* at 303. He noted that plaintiff was ambulatory, was "disabled from performing carpentry work in heavy construction," and his ability to resume work was "indefinite." *Id.*

### c. Annette Donnelly, D.C.

On March 8, 2013, Dr. Donnelly completed a treating source statement for New York State Office of Temporary and Disability Assistance, reporting that she had treated plaintiff for left leg pain and numbness, hip pain, and left buttock pain on twelve chiropractic sessions between January 30, 2012 and July 20, 2012. *Id.* at 346-55. Dr. Donnelly reported that as of July 2012, plaintiff was unable to lift or carry weight, could stand or walk for less than two hours a day, and could sit for no more than six hours a day. *Id.* at 349. However, Dr. Donnelly stated that because she had no recent evaluation of plaintiff, she could not provide a medical opinion regarding limitations of physical activity or plaintiff's ability to perform work-related activities. *Id.* at 349, 351.

## C. Medical Evidence/Non-Treating Sources

### 1. Radiology

An updated x-ray of plaintiff's lumbosacral on April 23, 2013 indicated that the height of the vertebral bodies and intervertebral disc spaces was relatively well maintained, the pedicles were intact, and there was no evidence of bony abnormality. *Id.* at 312.

11

### 2.  Chaim Shtock, D.O.

At the request of New York State Division of Disability Determination, Dr. Shtock conducted an orthopedic consultative medical examination on plaintiff on April 23, 2013.  *Id*. at 307-11.  Dr. Shtock noted that plaintiff had worked in the construction industry and had developed lower back pain on December 22, 2011.  *Id*. at 307.  Plaintiff discussed his medical history treatment, including having spinal surgery (a laminectomy and dissection at the level L4-L5 and L5-S1) and participating in physical therapy following surgery.  *Id*.  Plaintiff reported his symptoms as lower back pain, which he rated a four out of ten, and described the pain as a dull, stiff ache, aggravated by prolonged sitting, standing, bending, and walking.  *Id*.  He relayed that the pain was relieved by rest, refraining from aggravating activities and anti-inflammatory medications.  *Id*.  In addition, plaintiff reported that he experienced a dull ache in his mid back approximately one to two times a week, which he rated as a two or a three on a pain scale of one to ten.  *Id*.  The mid back pain was aggravated by prolonged sitting and relieved with rest, refraining from aggravating activities, and anti-inflammatory medications.  *Id*.  Plaintiff's current medication was Aleve, as needed.  *Id*.

With respect to his daily living activities, plaintiff reported that he is dependent on his wife for cooking, cleaning, laundry and shopping, but showered, groomed and dressed independently, and watched television, read books, and socialized with friends.  *Id*. at 308.  A physical examination revealed no acute distress, normal gait and stance, and no difficulty walking, changing for his examination, getting on or off the examination table, or rising from a chair.  *Id*.  Plaintiff was unable to perform a squat beyond 80% maximum capacity.  *Id.*

Additionally, he used a lumbar spine brace, which had been prescribed by his doctor in September 2012, and had no difficulty removing the brace for the exam. *Id*. At the time of the exam, plaintiff weighed 278 pounds and was 78 inches tall. *Id*.

An examination of cervical spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally. *Id*. His thoracic and lumbar spine revealed reduced flexion to 70 degrees, extension to 10 degrees, lateral flexion and rotary movements to 25 degrees. *Id*. at 309. In the lumbar spinal area, there was a post-operative scar noted, and tenderness in the SI joint, but no sciatic notch tendernss, spasms, or trigger points. *Id*. There was no scoliosis or kyphosis, straight leg raising was negative bilaterally, and plaintiff had full ranges of motion in his shoulders, elbows, forearms, wrists, and fingers bilaterally. *Id*. at 308. In his upper and lower extremities, his muscle strength was 4+/5 and there was no evidence of sensory deficit or muscle atrophy. *Id*. at 308-09. Plaintiff's hand and finger dexterity was intact and his grip strength was 4+/5 bilaterally. *Id*. at 308.

Dr. Shtock reviewed the August 2012 MRI and x-rays from the Hospital of Special Surgery which had indicated lumbar disc degeneration, facet arthrosis and central canal stenosis. *Id*. at 309. In addition, Dr. Shtock reviewed an updated lumbosacral spine x-ray performed on April 23, 2013 and noted that it was negative for abnormalities. *Id*. at 309, 312. Dr. Shtock diagnosed lower back pain, mid back pain, and history of lumbosacral surgery with laminectomy and discectomy at the L4-L5 and L5-S-1 levels. *Id*. at 309. Dr. Shtock's prognosis was "fair," and he opined that

13

> The claimant has mild to moderate limitations in heavy lifting, squatting, bending and crouching. He [has] mild to moderate limitation in frequent stair climbing. He has mild to marked limitation in walking long distances. He has mild limitation to standing long periods and sitting long periods. He has mild to moderate limitation in frequent bending. He has no limitation in performing overhead activities. He has no limitation using his hands for fine and gross motor activities.

*Id*. at 309-10.

### D. Vocational Evidence

Andrew J. Pasternak, a vocational expert, testified at the June 9, 2014 hearing on plaintiff's application for disability benefits. *Id*. at 60-70, 132. Pasternak classified plaintiff's past work as a construction carpenter, and opined that while the DOT classified this as a medium exertion skilled position, based on plaintiff's testimony, he performed the carpenter position at the heavy exertion level. *Id*. at 61-62. When asked by the ALJ if there were jobs in the national economy that could be performed by a hypothetical individual of plaintiff's age, education, and past work experience, who could lift and carry up to 20 pounds occasionally and 10 pounds; frequently, sit and stand for six hours out of eight; walk no more than one hour continuously and no more than two hours in an eight-hour work day; occasionally use stairs and ramps, stoop, kneel, crouch and crawl; but who could not climb ladders, ropes and scaffolds, Pasternak stated such an individual could not perform plaintiff's past work as a carpenter but could perform unskilled light jobs as a mail clerk, hand packager, and cafeteria attendant as these jobs are performed in the national economy. *Id*. at 62-63.

In addition, when asked by the ALJ if there were jobs that could be performed by a hypothetical individual with plaintiff's transferrable skills, Pasternak identified such transferable skills as "the use of hands and power tools of various kinds, . . . measuring skills and inspection skills," and testified that such an individual could perform semi-skilled light inspection jobs and

assembler jobs, such as an assembler of electrical equipment, a position existing in significant numbers in the national economy. *Id*. at 63-65. When asked by the ALJ whether the identified past work had skills transferrable to sedentary work, Pasternak stated that there were semi-skilled jobs at the sedentary level, such as an assembler of optical goods and a jewelry assembler, positions existing in significant numbers in the national economy. *Id*. at 65. When asked by the ALJ if there were jobs in the national economy that could be performed by the same hypothetical individual of plaintiff's age, education, and past work experience, who could lift up to 10 pounds; stand and/or walk for one hour in the course of an eight-hour work day; sit no more than five hours in the course of an eight-hour work day, Pasternak replied that such a description "would be less than sedentary" and thus such an individual would not be able to perform the jobs previously identified, and that competitive employment would not be possible for such a person. *Id*. at 66.

With respect to the light exertional jobs, the ALJ asked what the customary breaks that were afforded a worker at these jobs. *Id*. In response, Pasternak stated:

> The breaks would have to be no more than 15 percent of the work day, not counting lunch . . . . [I]f it was more than 15 percent, 20 percent or more, then there would be problems for that person to maintain competitive employment. They'd be away from the work station too much.

*Id*. at 67. When asked by the ALJ if his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and companion publications, Pasternak stated that it was based on his experience, studies that have been done that he was "privy to in his professional capacity," and in accordance with the DOT. *Id*. at 67-68.

Plaintiff's attorney asked Pasternak about the jobs he listed in response to the ALJ's hypotheticals, including mail clerk, hand packager, cafeteria attendant, and queried whether a

person could engage in competitive employment if they had two work absences a week.  *Id.* at 69.  In response, Pasternak replied in the negative stating that given that many absences, the position would no longer be competitive, and opined that two absences a month would be "the borderline of acceptable."  *Id.*

## DISCUSSION

### I.  Standard of Review

#### A.  Review of the ALJ's Decision

In reviewing a decision of the Commissioner, a district court may set aside a determination "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole."  *Greek v. Colvin,* 802 F.3d 370, 374-75 (2d Cir. 2015) (citations omitted); *see* 42 U.S.C. § 405(g).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales,* 402 U.S. 389, 401) (internal quotation marks omitted)).  Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case *de novo.  Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir. 2004); *see Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir. 1998) ("[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record"); *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991) (holding that if the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo*

16

review"). Thus, the only issue before the Court is whether the ALJ's finding that plaintiff was not eligible for disability benefits was based on "legal error" or is not supported by "substantial evidence." *Greek,* 802 at 374-75.

## B.  Eligibility for Disability Benefits

To be eligible for disability benefits under the Social Security Act ("SSA"), a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *see Burgess v. Astrue,* 537 F.3d 117, 119 (2d Cir. 2008). The SSA further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see Shaw v. Chater,* 221 F.3d 126, 131-32 (2d Cir. 2000).

The SSA has promulgated regulations[3] prescribing a five-step analysis for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520; 416.920. The Second Circuit has summarized this procedure as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third

---

[3] Although the SSA was amended effective March 27, 2017, because the plaintiff's application was filed before the new regulations went into effect, the Court reviews the Commissioner's decision under the earlier regulations. *See Lowry v. Astrue,* 474 F. App'x 801, 805 n.2 (2d Cir. 2012) (applying regulation in effect at the time the ALJ's adjudicated plaintiff's application).

inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education and work experience . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant can perform.

*Telavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012).  The claimant bears the burden of proof at steps one through four of the sequential inquiry, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working.  *Id.*

## II.    Analysis

### A.  The ALJ's Decision

At step one, the ALJ determined that plaintiff had not engaged in substantial activity since the initial alleged onset date of December 22, 2011 through his date last insured of December 31, 2016.  *Id*. at 18.  At step two, the ALJ found that plaintiff had the following severe impairments:  obesity, degenerative disc and joint disease of the lumbar spine, status post lumbar decompression and discectomy, and degenerative changes of the thoracic spine.  *Id*.  At step three, the ALJ found that none of plaintiff's impairments, both singly or in combination, met or medically equaled the severity of one of the listed impairments in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id*. at 19.  The ALJ then assessed plaintiff's residual functional capacity ("RFC") and determined that he had the RFC to perform less than a full range of light work as defined in 20 C.F.R. 404.1567(b),[4] in that plaintiff was able to lift/carry

---

[4] Light work (i) involves lifting no more than 20 pounds at a time, with frequent lifting or

and push/pull 20 pounds occasionally and 10 pounds frequently; was capable of sitting or standing for six hours; walking two hours in an eight-hour workday, with continuous walking limited to one hour; was limited to occasional climbing of ramps and stairs, stoop, kneel, crouch and crawl; but was unable to climb ladders, ropes, or scaffolds. *Id*. at 19.

At step four, with input from a vocational expert, the ALJ concluded that plaintiff was not able to perform his past relevant work as a carpenter (which he had performed at a heavy level of exertion), because plaintiff was reduced to performing a range of light work. *Id*. at 25. The ALJ proceeded to the final step of the five-step process and determined that, considering plaintiff's age, education, work experience, transferrable work skills, RFC and the vocational expert's testimony, there were jobs that existed in significant numbers in the national economy that plaintiff could perform. *Id*. at 25-26. The ALJ found that plaintiff was, therefore, not disabled under the SSA from the onset of his disability on December 22, 2011 through the date of the ALJ's decision. *Id*. at 27.

Plaintiff now challenges the ALJ's decision finding that plaintiff was not disabled during the relevant period. Plaintiff argues principally that the ALJ failed to properly weigh the record evidence, thereby failing to properly determine plaintiff's residual functional capacity. *See* DE 20, 24. The Commissioner disagrees and maintains that the ALJ's decision was supported by substantial medical evidence. DE 22, 24.

---

carrying of objects weighing up to 10 pounds; (ii) requires a good deal of walking or standing, on and off, for a total of approximately six hours in an eight-hour workday, with sitting occurring intermittently at the time; or (iii) may involve sitting most of the time with pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b); Social Security Ruling 83-10.

### B. Weight Accorded Medical Opinions

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue,* No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1527(c); 416.9279(c).  Social Security regulations require that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004). Medically acceptable clinical and laboratory diagnostic techniques include consideration of a "patient's report of complaints, or history, [a]s a diagnostic tool." *Green-Younger v. Barnhart,* 335 F.3d 99, 107 (2d Cir. 2003); *see Petrie v. Astrue,* 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient"). Although a treating physician may share an opinion regarding the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(1); *see Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir. 1999).

When the ALJ declines to give a treating physician's opinion controlling weight, the ALJ "must consider various factors to determine how much weight to give to the opinion." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). These factors include "(i) the length, nature and extent of the

treatment relationship; (ii) the evidence in support of the treating physician's opinion, (iii) consistency of the opinion with the entirety of the record; (iv) whether the treating physician is a specialist; and (v) other factors that are brought to the attention of the SSA that tend to support or contradict the opinion." *Id.*; *see Selian,* 708 F.3d at 418. The ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Burgess,* 537 F.3d at 129-30; *see* 20 C.F.R. § 404.1527(d)(2). Failure to provide "good reasons" for the weight assigned to a treating physician constitutes a ground for remand. *Snell,* 177 F.3d at 133; *see Halloran,* 362 F.3d at 32-33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians['] opinion").

Furthermore, the ALJ has an obligation "to recontact a treating physician for clarification if the treating physician's opinion is unclear." *McAllister v. Colvin,* 205 F. Supp. 3d 314, 331 (E.D.N.Y. 2016) (internal quotation marks and citations omitted); *see also Calzada v. Astrue,* 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician"). Such a duty is linked to the ALJ's affirmative obligation to develop the record. *Burgess,* 537 F.3d at 129; *see also Perez v. Chater,* 77 F.3d 41, 47 (2d Cir. 1996) ('Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record").

By contrast, the opinions of non-treating sources, to wit, a consultative medical doctor or a non-examining medical expert, should be accorded less weight than treating sources in the

overall evaluation of disability. *See Selian,* 708 F.3d at 419 ("ALJs should not rely heavily on the findings of consultative physicians after a single examination"); *see Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) ("[I]n evaluating a claimant's disability, a consulting physician's opinions or report should be given limited weight . . . because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day."); *Hidalgo v. Bowen,* 822 F.2d 294, 297 (2d Cir. 1987) (A "corollary to the treating physician rule is that the opinion of a non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis"). Moreover, the SSA regulations point out that even where a treating physician's opinion is not entitled to "controlling weight," the opinion is generally entitled to "more weight" than the opinions of non-treating and non-examining sources. 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); *see* Social Security Ruling 96-2p (S.S.A. July 2, 1996) ("In many cases a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight").

### C. **Evaluation of the Medical Evidence**

Upon careful review of the administrative record and the ALJ's decision, the undersigned finds that the ALJ failed to properly evaluate the medical evidence. As set forth below, the ALJ accorded less than controlling weight to the opinions of plaintiff's treating physicians and gave greater weight to the opinion of the consultative medical examiner, without articulating "good reasons" for the weight assigned and failed to fully develop the record in accordance with the applicable regulations.

In his decision, the ALJ found that plaintiff had the following severe impairments: obesity, degenerative disc and joint disease of the lumbar spine, status post lumbar decompression and discectomy, and degenerative changes of the thoracic spine.  Tr. at 18. Notwithstanding this finding, the ALJ found that plaintiff was not disabled because he had the residual functional capacity to perform less than a full range of light work as defined in 20 C.F.R. § 404.1567(b) in that plaintiff was able to lift/carry and push/pull 20 pounds occasionally and 10 pounds frequently; was capable of sitting or standing for six hours; walking two hours in an eight-hour workday, with continuous walking limited to one hour; was limited to occasional climbing of ramps and stairs, stoop, kneel, crouch and crawl; but was unable to climb ladders, ropes, or scaffolds.  *Id*. at 19.  In weighing the medical opinions, the ALJ gave "some weight" to the opinions of treating physicians Dr. Keith, Dr. Geiger, and Dr. Farmer; "little weight" to the opinion of Dr. Donnelly; and "considerable weight" to the report of the consultative medical examiner Dr. Shtock.  *Id*. at 22-25.  With respect to Dr. Keith and Dr. Donnelly, the ALJ discounted their opinions in part because they were rendered prior to the September 2012 surgery.  *Id*. at 24-25.

Although the ALJ acknowledged that Dr. Farmer completed two "Pension Disability Affidavit Attending Physician's Statements" as well as his progress note, the ALJ failed to articulate good reasons for assigning less than controlling weight to these opinions.  In the decision, the ALJ focused primarily on the post-operative records stating:

> The most recent of these examinations, from March 28, 2013, indicated that the claimant was doing well although experiencing an achy back when he was too active.  It was noted that the claimant has been limited in his ability to perform any type of heavy activities

23

with a physical examination noting 5/5 strength in the lower extremities bilaterally with no sensory deficits.  Dr. Farmer added that the claimant is doing reasonably well and that he would not be able to perform his heavy duties that he normally performed at work.  The undersigned finds Dr. Farmer's assessments to be consistent with precluding the claimant from his prior relevant work as a carpenter, but not precluding him from work completely. . . .

Dr. Farmer opined on February 7, 2013 that the claimant cannot return to his prior work, and also indicated on March 28, 2013 that the claimant is not going to be able to perform heavy duties that he normally performed at work.  These assessments are given some weight considering Treating Physician Dr. Farmer is a board certified orthopedic surgeon, and his opinion is supported by the overall record.

*Id.* at 23-24.  The ALJ, however, failed to reference and/or provide good reasons for discounting Dr. Farmer's reports that plaintiff had had leg pain involving the buttocks, groin, lateral calf, that x-rays showed a large central canal disc herniation at L4-L5, L-5, nerve compression, L5-S1 disc protrusion, and that his diagnosis was status post lumbar decompression and lumbar discectomy. *Id.* at 305, 319-20.  Moreover, the ALJ failed to note limitations set forth in Dr. Farmer's assessments that plaintiff was still recovering from surgery, his ability to resume work was indefinite, he had a limited ability to stand and walk, and was continuing with physical therapy. *Id.*

Additionally, while the ALJ recognized and assigned "some weight" to Dr. Geiger's medical source statement dated February 21, 2013 in which he assessed plaintiff as precluded from engaging in carpentry work and heavy construction due to his back injury, the ALJ failed to reference or address Dr. Geiger's opinion that plaintiff's ability to resume work was indefinite. *Id.* at 303.

24

In contrast, the ALJ assigned "considerable weight" to the non-treating source, who performed a consultative examination on plaintiff, as follows:

> Orthopedic Consultative Examiner Dr. Shtock examined the claimant on April 23, 2013 and opined the claimant had *mild to moderate* limitations in heavy lifting, squatting, bending, and crouching. Other limitations included *mild to moderate* limitation in *frequent* stair climbing, walking *long* distances, and *frequent* bending as well as *mild* limitations in standing *long* periods, and sitting *long* periods. The opinion is accorded considerable weight as it was made following an examination by a duly qualified physician. While this opinion is somewhat *vague*, the functional limitations are consistent with his examination of the claimant and the other evidence of the record. The examination noted that the claimant had normal gait, was able to walk on toes/heels without difficulty, and was not in any acute distress. The cervical spine had full range of motion without any pain, spasm, or trigger points. The bilateral upper extremities were also within normal limits. The lumbar spine did show a somewhat reduced range of motion with some tenderness reported, but no spasm, trigger points, and straight leg raising was negative. The lower extremities were also within normal limits with motor strength 4+/5. Neurologically, the claimant was intact with physiologic and equal reflexes, no muscle atrophy and sensory abnormality. The undersigned finds this physical examination to be consistent with the other post-operative evaluations, and with the above residual functional capacity assessment.

*Id.* at 24-25 (emphasis supplied). This opinion, however, is at odds with those of the treating physicians, who found plaintiff's exertional abilities to be much more limited. The Second Circuit has made clear that "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian v. Astrue,* 708 F.3d 409, 419 (2d Cir. 2013); *see Giddings v. Astrue,* 333 F. App'x 649, 652 (2d Cir. 2009) (holding a consultative physician's opinion is generally entitled to "little weight").

Here, the ALJ not only failed to discuss and provide good reasons for according Dr. Farmer and Dr. Geiger's opinions less than controlling weight, but declined to address the treating physicians' assessments that plaintiff's ability to return to work was "indefinite," and Dr. Farmer's determination that he was still recovering from spinal surgery. This is particularly

25

troubling given the ALJ's ultimate conclusion that "the evidence as a whole" reflected that plaintiff could perform less than a full range of light work.  *See Sutherland v. Barnhart,* 322 F. Supp. 2d 282, 290 (E.D.N.Y. 2004) ("Factual determinations, based on the weighing of evidence, are within the ALJ's competence; however, in making these determinations, the ALJ must address the evidence in the record. . . .  "[T]he ALJ's failure to mention several parts of the record which contradicts his conclusion is error"); *see also Sander v. Comm'r of Soc. Sec.,* 506 F. App'x 74, 77 (2d Cir. 2012) (Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand").  In short, the ALJ's determination that the post-surgery opinions of plaintiff's treating physicians were entitled to only "some weight" appears to be the result of an incomplete analysis of the factors set forth in the treating physician rule as well as an incomplete evaluation of their assessments.

Moreover, the ALJ failed to fully develop the record with medical evidence central to case, *viz.*, plaintiff's residual functional abilities following his surgery during the relevant period. A residual functional capacity ("RFC") determination indicates the most an individual can still do despite his or her impairments.  20 C.F.R. § 404.1545(a).  It takes into consideration the claimant's physical and mental limitations, symptoms, including pain, and all other relevant evidence in the case record.  *Id.*  With respect to physical abilities, the RFC assessment includes consideration of an individual's exertional capabilities, including the ability to sit, stand, walk, lift, carry, push, and pull.  20 C.F.R. § 404.1545(b).  Non-exertional limitations such as reaching, handling, stooping, or crouching are also considered.  *Id.*

As discussed *infra*, rather than requesting an RFC assessment from plaintiff's treating sources, the ALJ relied heavily on the findings of the non-treating source, Dr. Shtock, that plaintiff had, *inter alia*, "mild to moderate" limitations in heavy lifting, squatting, bending and crouching; "mild to moderate" limitation in "frequent" stair climbing, walking "long" distances, and "frequent" bending; "mild" limitations in standing "long" periods and sitting "long" periods. This assessment, however, is too vague to provide sufficient support for the ALJ's specific functional assessments that plaintiff could, for example, lift/carry and push/pull 20 pounds occasionally and 10 pounds frequently; was capable of sitting or standing for six hours; walking two hours in an eight-hour workday, with continuous walking limited to one hour. *See Selian,* 708 F.3d at 421 (finding the consultative examiner's opinion "remarkably vague," because "[w]hat the [consultative examiner] means by 'mild degree' and 'intermittent' is left to the ALJ's sheer speculation. . . . [The] opinion does not provide substantial evidence to support the ALJ's finding that [the claimant] could lift 20 pounds occasionally and 10 pounds frequently"); *Hilsdorf v. Comm'r of Soc. Sec.,* 724 F. Supp. 2d 330, 348 (E.D.N.Y. 2010) (holding that the consultative examiner's statement that plaintiff had "limitations of a mild degree of lifting, bending, walking, standing, and pushing and pulling on arm controls" could not serve as an adequate basis for determining the plaintiff's RFC because it "did not provide enough information to allow the ALJ to make the necessary inference that [the] [p]laintiff could perform sedentary work"); *see also Ubiles v. Astrue,* No. 11-CV-6340, 2012 WL 2572772, at *11 (W.D.N.Y. July 2, 2012) (holding that the consultative examiner's opinion that plaintiff had

"moderate limitations in standing, walking, climbing stairs, and lifting minor weights . . . was entirely too vague to swerve as a proper basis for an RFC").

The ALJ acknowledged that the opinion was "somewhat vague," but nevertheless without seeking clarification found the opinion consistent with Dr. Shtock's examination of the plaintiff and the other evidence in the record.  While Dr. Shtock's findings included detailed observations of plaintiff's functioning, the findings did not address plaintiff's capabilities relevant to less than light residual functional capacity.  *See Curry v. Apfel,* 209 F.3d 117, 123 (2d Cir. 2000), *superceded by statute on other grounds,* 20 C.F.R. § 404.1560(c)(2) (explaining that a consultative examiners' "use of the terms 'moderate' and 'mild,' without additional information, does not permit the ALJ, a layperson notwithstanding her considerable and constant exposure to medical evidence, to make the necessary inference that [claimant] can perform the exertional requirements of sedentary work").

Because there is not sufficient medical evidence supporting the ALJ's RFC determination that plaintiff could perform less than light work, the ALJ was obligated to develop the record and obtain a functional capacity assessment from plaintiff's treating physicians, Dr. Farmer and/or Dr. Geiger.  *See Felder v. Astrue,* No. 10-CV-5747, 2012 WL 3993594, at *11 (E.D.N.Y. Sept. 11, 2012) ("The ALJ's duty to develop the record includes ensuring that the record as a whole is complete and detailed enough to allow the ALJ to determine the claimant's RFC"); *Johnson v. Astrue,* 811 F. Supp. 2d 618, 630 (E.D.N.Y. 2011) (noting that the ALJ "has an affirmative duty to request RFC assessments from plaintiff's treating sources despite what is otherwise a complete medical history"); *Lawler v. Astrue,* No. 10-CV-3397 (ARR), 2011 WL 5825781, at *7

28

(E.D.N.Y. Nov. 14, 2011) ("An ALJ's affirmative obligation to develop the record also includes the obligation to contact a claimant's treating physicians and obtain their opinions regarding the claimant's residual functioning capacity"); *see also Marshall v. Colvin,* No. 12-CV-6401, 2013 WL 5878112, at \*9 (W.D.N.Y. Oct. 30, 2013) ("Where a treating physician as not assessed a claimant's RFC, the ALJ's duty to develop the record and request the treating physician's assessment of the claimant's functional capacity").  The ALJ's failure to seek additional medical evaluations from plaintiff's treating sources and to apply the proper standard to assess plaintiff's functional capacity deprived plaintiff of a "full hearing." *Echevarria v. Secretary of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982); *see Johnson,* 811 F. Supp. 2d at 630.

In summary, because the ALJ failed to provide good reasons for declining to assign controlling weight to the treating physicians' opinions and to adequately develop the medical record, remand is warranted.  Accordingly, the undersigned respectfully recommends that the matter be remanded to allow the ALJ to properly develop the record completely and clarify his reasons for his decision.[5]

## CONCLUSION

---

[5] In light of the recommendation that the case be remanded based on the ALJ's errors regarding the treating physician rule and failure to develop the record, the undersigned does not address plaintiff's other arguments that the ALJ failed to consider his subjective complaints and improperly relied on the vocational expert's testimony.  DE 20, 23.  However, the undersigned further respectfully recommends that upon remand, the ALJ reconsider plaintiff's testimony and credibility after the proper application of the treating physician rule and development of the record, and if necessary, reconsider the vocational expert's testimony.  *See Vlado v. Berryhill,* No. 16-CV-794 (MKB), 2017 WL 1194348, at \*13 n.10 (E.D.N.Y. Mar. 29, 2017); *McAllister v. Colvin,* 205 F. Supp. 3d 314, 330 n.3 (E.D.N.Y. 2016); *Morris v. Colvin,* No. 15-CV-5600 (JFB), 2016 WL 7235710, at \*10 (E.D.N.Y. Dec. 14, 2016).

For the foregoing reasons, the undersigned respectfully recommends that the district court deny plaintiff's motion for judgment on the pleadings, deny the Commissioner's cross-motion for judgment on the pleadings, and remand the case to the ALJ for further proceedings consistent with this Report and Recommendation.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel for each of the parties. Any written objections to the Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. **Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court of Court of Appeals.** *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.").

Dated:  Central Islip, New York
　　　　August 30, 2018

　　　　　　　　　　　　　　　　　 /s/ Gary R. Brown
　　　　　　　　　　　　　　　　　GARY R. BROWN
　　　　　　　　　　　　　　　　　United States Magistrate Judge